## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 09 2018, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

S.J., J.F., A.K., and A.J. (Minor Children),

and

J.C. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

March 9, 2018

Court of Appeals Case No. 28A01-1708-JT-1835

Appeal from the Greene Circuit Court

The Honorable Erik C. Allen, Judge

Trial Court Cause Nos. 28C01-1609-JT-16, 28C01-1609-JT-18, 28C01-1609-JT-21, 28C01-1609-JT-23

**Altice, Judge.**

## Case Summary

J.C. (Mother) appeals following the termination of her parental rights to her four children, J.F., S.J., A.J., and A.K.[1] Mother challenges a number of the trial court's specific findings and conclusions as clearly erroneous.

We affirm.

## Facts & Procedural History

Mother gave birth to J.F. in June 2009 at the age of eighteen and then had S.J. in September 2011. While pregnant with A.J. in August 2012, Mother moved from Florida to Indiana after her then boyfriend, the father of S.J. and A.J., was picked up by bounty hunters and returned to face drug charges in Louisiana. Mother moved herself, J.F., and S.J. in with her mother (Grandmother) in Bloomfield. They lived in a one-bedroom home, and Mother, J.F., and S.J. slept on the couch or floor. Mother's brother (Uncle) also stayed at the home from time to time. Grandmother cared for the children when Mother worked.

On December 7, 2012, the Indiana Department of Child Services (DCS) became involved with the family after a methamphetamine lab was discovered

---

[1] The parental rights of three fathers were also terminated in the proceedings below, but the fathers do not participate in this appeal. Accordingly, our discussion of the facts is limited to those pertinent to the termination of Mother's parental rights. We note that each of the fathers has a history of drug and/or other criminal involvement and has been incarcerated during at least some of the underlying proceedings.

in a shed on the property and Uncle was arrested for manufacturing methamphetamine. DCS Family Case Manager (FCM) Heather Harris came to the home that evening. Mother was at work and J.F. and S.J. were in the care of Grandmother, who admitted using marijuana and methamphetamine but denied being under the influence. Grandmother submitted to a drug screen that later tested positive for methamphetamine.

[5] FCM Harris allowed J.F. and S.J. to remain in the home, and she returned the following day to speak with Mother. FCM Harris learned that Mother and the children did not have beds and observed that Mother had difficulty parenting the children and the home was in disarray. Mother admitted that she needed help with parenting and meeting the needs of J.F. and S.J. A safety plan was developed and Mother was offered services through DCS so that the children could remain in the home.

[6] On December 13, 2012, DCS filed petitions alleging that J.F. and S.J. were children in need of services (CHINS), and the children were so adjudicated on January 17, 2013, following a hearing. On February 18, 2013, the trial court issued a lengthy dispositional order, requiring Mother to participate in services and treatment plans and maintain stable income and housing. Among the many requirements, Mother was ordered to refrain from alcohol (when children are in her care) and drug use and submit to random drug/alcohol screens. The children remained in the home, and Mother received services to assist her with parenting, employment, and housing. She was also referred to therapy for substance abuse.

[7] Shortly after A.J. was born in March 2013, Mother was charged with operating while intoxicated (OWI) and subsequently pled guilty in September 2013, resulting in one year of probation and required substance abuse treatment. Thereafter, late in the evening on November 16, 2013, Mother drove under the influence of alcohol with two of her children in the car. She struck a telephone pole and the vehicle flipped over. All three were taken to the hospital, and J.F. received treatment for a two-inch laceration on his face.

[8] As a result of the OWI accident, Mother's probation in the earlier OWI case was revoked and new charges were filed against her. She eventually pled guilty to Class D felony OWI and, on November 4, 2015, was sentenced to 1095 days with 915 days suspended to probation and 180 days of electronic monitoring. As a condition of probation, Mother was ordered to complete substance abuse treatment. In another cause, she pled guilty in March 2015 to attempted battery on a public safety official and received one year of probation.

[9] DCS immediately removed all three children after the November 2013 accident and placed them in foster care. A CHINS petition was filed with respect to A.J., and A.J. was later adjudicated a CHINS like S.J. and J.F. DCS provided services to Mother, including homebased case management, supervised visits, substance abuse treatment, therapy, random drug screens, and recovery coaching. Mother completed a substance abuse assessment and participated in group therapy sessions through Centerstone from June to September 2014. Although Mother had a number of negative drug screens through August 2014,

she tested positive for methamphetamine in April and November 2014. She was not screening regularly in the latter part of 2014.

[10] In the fall of 2014, Mother fell out of compliance with services and was not cooperating with DCS. Following a permanency hearing on November 3, the permanency plan was changed from reunification to concurrent plans of reunification and adoption. The court made the following findings in its order:

> Mother has not been compliant with [] services. Mother has not made any progress towards reunification. She currently is pregnant with her fourth child. She does not have a residence of her own and does not have means to provide for her children. Mother has failed to participate and comply with services.

*Exhibits* at 43 (Exhibit A-12).

[11] On January 1, 2015, Mother gave birth to A.K. and admitted using methamphetamine two days earlier and other times during the pregnancy. Mother and A.K. tested positive for methamphetamine. Mother's boyfriend at the time, who is the father of A.K., also admitted using methamphetamine and indicated that he had a significant substance abuse problem. Additionally, Mother did not have a crib, car seat, or clothing for A.K., nor a permanent residence or a job. Mother acknowledged that she needed help and indicated that she wanted inpatient drug treatment. A.K. was taken into custody by DCS upon release from the hospital, and a CHINS petition was filed. Mother and her boyfriend subsequently admitted the allegations contained in the petition, and A.K. was adjudicated a CHINS on February 16, 2015.

[12] After A.K.'s removal, Mother began complying with services and working to maintain sobriety. FCM Lisa Burton spoke at length with Mother regarding inpatient treatment and worked with her to apply for inpatient treatment at Life Springs. Mother completed a mental health evaluation, took a TB test, and filled out demographic information required for admission to Life Springs. When the admissions process neared an end, however, Mother informed FCM Burton that she had changed her mind. Mother had a full-time job at Heartland Automotive, which she started in January 2015, and was concerned about losing it if she went to inpatient treatment. Because Mother had been sober for a few months already, FCM Burton agreed that Mother could do outpatient treatment instead. Accordingly, Mother was referred to Hamilton Center, where she completed an assessment in April 2015. Mother then attended group and individual therapy and had a recovery coach through Hamilton Center.

[13] By summer 2015, Mother was doing very well and working toward reunification with her children. She was working at Heartland Automotive, cooperating with DCS, visiting the children, and maintaining her sobriety. At this time, it was noted by a service provider that Mother had significantly improved her ability to parent the children. In a periodic case review order issued June 29, 2015, the court indicated that the projected date for the children's return home was August 19, 2015.

[14] The children were returned to Mother's care for a trial home visit (THV) on August 21, 2015, as Mother had been sober for nearly eight months. Mother did well at the beginning of the THV but still struggled with parenting and

addressing the children's behavioral issues. During this time, the CASA and FCM Burton observed the children to be out of control, with Mother having great difficulty parenting them.[2] Accordingly, the family received additional services, including homebased therapy, to assist Mother with parenting skills. DCS continued to monitor the home and Mother's sobriety.

[15] In October 2015, Mother lost her job at Heartland Automotive[3] and "things kind of spiraled for her" as she struggled with stress and financial demands. *Transcript Vol. 2* at 69. Around this same time, Mother began dating a man that she had met on Facebook. He brought drugs into the home and was abusive to her, and the older children were afraid of him. In November 2015, Mother failed a drug test given by the probation department, which resulted in DCS providing additional services and developing a safety plan for her. Mother relapsed again the next month, testing positive for methamphetamine on December 14, 2015. After this relapse, the children were removed from her home on December 17, 2015, and placed back in foster care. They have not been returned to Mother's care. The THV lasted less than four months.

[16] Following a review hearing on January 4, 2016, the trial court approved DCS's request to modify the permanency plan to adoption for each of the children.

---

[2] FCM Burton had observed the children in their foster care setting prior to the THV and testified that the children did not exhibit the same bad behaviors in foster care.

[3] Mother's employment at Heartland Automotive lasted about nine months, which remains her longest stretch of employment.

Thereafter, Mother was allowed therapeutic visits with the children that were scheduled to taper down and end by April. Mother has not seen the children since April 2016.

[17] A review hearing was held on April 4, 2016, after which Mother refused a drug screen. By this time, Mother had spent time in jail for violating the rules of home detention by using methamphetamine. Although services remained open for her, Mother did not engage in services and had no further contact with DCS until October 2016. For most of 2016, Mother was either in jail for probation violations[4] or living "here and there". *Transcript Vol. 2* at 223. She had no permanent residence or stable employment.

[18] On September 2, 2016, the trial court issued an order approving the permanency plan of adoption and the initiation of termination proceedings. The court noted that Mother had not participated in services or had contact with DCS since April. Mother's noncompliance was noted again following a review hearing in the CHINS case on December 5, 2016, which Mother did not attend.

[19] On September 27, 2016, DCS filed the petitions to terminate Mother's parental rights to each of her four children. Mother appeared for the initial termination hearing on December 12, 2016. This was the first time in eight months that any

---

[4] Mother violated probation again in April 2016 by missing probation appointments, failing to complete substance abuse counseling, and failing to report for urine screens. Probation violations were filed in two separate criminal cases. By Mother's own accounts, she spent about four months total in jail during 2016.

of Mother's FCMs had seen her. The current FCM, Madison Fox, spoke with Mother after the hearing and asked Mother to contact her to obtain services. FCM Fox, however, did not hear from Mother for another five months until just before the final termination hearing, which began on June 13, 2017. By that time, Mother had not cooperated with DCS for well over a year.

[20] At the termination fact-finding hearing, Mother acknowledged that she had been in and out of jail in 2016, had not had steady full-time employment since October 2015, and had only recently obtained a place to live. In February 2017, Mother moved with her new boyfriend to Indianapolis, where they rented a room in a four-bedroom house. Mother began working part time in March 2017 for "an appliance man in Indianapolis." *Id*. at 224. Although she claimed to be sober during the months leading up to the hearing, Mother had not submitted to drug screens for verification by DCS. Mother indicated that if the children were returned to her care, she would continue living in the same home and would "probably get a full time job." *Id*. at 241. She stated that she still needed services and would like to go to inpatient treatment.

[21] The CASA, who had been with the family since DCS's initial involvement in December 2012, testified, "in reality, after all of these years, we are not in any better place with [Mother] now then [sic] when we started." *Id*. at 147. On the other hand, the children were doing amazingly well in their pre-adoptive foster home and were now well-mannered, loving children. The CASA expressed great concern if the children were placed back with Mother:

It would be the most devastating thing to these children to take them out of the home that they are in because for the first time, the first time since I have been on this case, they are in a safe, secure atmosphere and they love the people that they are with. They are settled into the community. Two of them are in school and they have adjusted, the children that [FCM Burton] and I took out of [Mother's] home the night that they were removed if you would see, if you had saw those children then and if you saw them now, you would not even think they were the same children.

*Id.* She opined that returning the children to Mother would be traumatizing to the children and "even more traumatizing to [Mother]." *Id.* Further, the CASA testified that she believed termination was in the best interests of the children.

[22] FCM Fox testified that the children have been in their pre-adoptive home since July 2016 and have a great bond with their foster parents. DCS's plan following termination is for the children to be adopted together by their foster parents. With respect to Mother, FCM Fox noted that Mother had not seen her children or participated in services for over a year. Further, DCS did not know whether Mother was in fact sober.

[23] On July 27, 2017, the trial court issued a lengthy order terminating mother's parental rights to J.F., S.J., A.J., and A.K. Mother now appeals. Additional facts will be provided below as needed.

## Discussion & Decision

[24] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[25] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[26] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet

their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[27] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C).

[28] In this case, the trial court issued 117 findings of fact and 45 conclusions of law, some of which would be more appropriately denominated as findings of fact. Mother begins her appellate argument by challenging a handful of these specific findings. Her arguments with regard to most of these amount to improper requests to reweigh the evidence and to credit her testimony over others. For example, she challenges finding number 51, which provides:

> After [A.K.'s] birth, Mother indicated to the FCM that she believed she needed inpatient drug treatment to address her substance abuse problems. However, Mother was provided the paperwork to seek admission to an in-patient facility, but she never followed through with the admissions process. During later discussions about in-patient treatment Mother did not want to do in-patient treatment because she didn't want to lose her job.

*Appendix Vol. II* at 13. Relying exclusively on her own testimony, Mother argues that she begged for inpatient treatment and that her attempts to obtain such treatment at three different facilities were thwarted by FCM Burton. There is ample evidence, however, that contradicts Mother's testimony. This evidence establishes that it was Mother's decision to forgo inpatient treatment because she did not want to lose her job at Heartland Automotive. Prior to this decision, FCM Burton had worked with Mother to gain her admission into inpatient treatment at Life Springs. Mother began the admission process but, in the end, chose not to follow through. The trial court's finding in this regard is not clearly erroneous, nor is the similar finding number 116.

[29]     Mother next challenges findings number 76 and 113, which both address her testimony regarding the children's behavior during the THV.  The findings indicated that Mother vacillated during her testimony in describing the degree of their poor behavior and whether she could properly handle them.  On appeal, Mother complains that she never testified that their behavior was normal for children that age.  Although Mother testified in detail regarding the behavior of her older children during the THV, she later clarified: "My kids weren't causing me that much of a problem, they are kids they are going to be bad sometimes." *Transcript Vol. 3* at 64.  In light of Mother's seemingly inconsistent testimony, the trial court's findings number 76 and 113 were not clearly erroneous.

[30]     Next, Mother challenges the portion of finding number 89 that indicates she "admitted using Xanax without a valid prescription on April 4, 2016." *Appendix Vol. II* at 17.  The testimony of FCM Fox indicated that after the hearing, Mother "admitted to using Xanax but refused a drug screen". *Transcript Vol. 2* at 197.  One could reasonably infer from Mother's *admission* that she did not have a valid prescription.  Regardless, Mother's use of Xanax with or without a prescription is not what led to the termination of her parental rights.[5]

[31]     We agree with Mother that a few of the trial court's findings contain errors.  Indeed, in finding number 72, the trial court indicated that the THV started on

---

[5] We note that Mother challenges specific language in finding number 86 that does not even appear in that finding.  Moreover, her argument in this regard does not establish clear error.

August 15, 2015, while the actual date was six days later. Additionally, in finding number 52, the trial court indicates that Mother testified she did not have a serious drug problem and could quit on her own but then testified that she needed inpatient treatment. This is not a fair characterization of Mother's testimony. She testified that when she was using during her 2014 pregnancy, she did not feel as though she had a substance abuse issue. At the time of the termination hearing, however, Mother clearly stated that she had a problem requiring inpatient treatment. Finally, in conclusion 27, the trial court makes an incorrect factual statement that Mother's visitation with the children ended in April 2016 "after therapeutic visits were unsuccessful." *Appendix Vol. II* at 17. The visits ended in April 2016 as scheduled, not because they were unsuccessful.

[32] The few noted inaccuracies in the trial court's findings, however, do not affect our confidence in the trial court's judgment. As will be discussed more fully below, the extensive remaining findings provide ample support for the court's ultimate conclusions necessary to sustain the judgment. Therefore, reversal is not warranted based on these minor errors. *See In re B.J.*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008) ("Because there is evidence sufficient to support the trial court's ultimate findings on the elements necessary to sustain the judgment, we hold that the erroneous finding was merely harmless surplusage that did not prejudice Mother and, consequently, is not grounds for reversal."), *trans. denied*.

[33] With respect to the statutory elements necessary for termination, Mother first challenges the trial court's finding pursuant to subsection I.C. § 31-35-2-4

(b)(2)(B)(i) that there is a reasonable probability that the conditions resulting in the children's removal and continued placement outside her care will not be remedied. In making such a determination, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id.* The trial court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[34] Additionally, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Although a trial court is required to give due regard to changed conditions, this does not preclude a finding that a parent's past behavior is the best predictor of his or her future behavior. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014).

[35] The record establishes that DCS provided services to Mother to address home conditions, parenting skills, substance abuse, employment, mental health, and general stability. DCS began providing services to the family in December 2012 and worked with Mother to keep the children at home. Despite these services and the CHINS adjudications, Mother chose to drive while intoxicated on at least two occasions in 2013 after giving birth to her third child, A.J. On the second occasion, she did so with two of her young children in the car and crashed into a telephone pole, flipping the car and resulting in injuries to J.F. Mother's OWIs resulted in criminal convictions, a probation violation, the removal in November 2013 of J.F., S.J, and A.J. from her home, and A.J.'s CHINS adjudication.

[36] Thereafter, additional services were provided to Mother, who complied for a period of time and remained drug-free for several months during the summer of 2014. By late 2014, however, she fell out of compliance with services and used methamphetamine multiple times while pregnant with her fourth child, A.K. Mother used methamphetamine in a parking lot just two days before giving birth to A.K., and she was wholly unprepared to bring the infant home. Mother indicated that she needed inpatient drug treatment and admitted that A.K. was also a CHINS.

[37] Mother's longest stretch of sobriety, compliance with services, and steady employment began after A.K.'s removal in January 2015. FCM Burton helped Mother with the process of applying for inpatient treatment at Life Springs. Just before admission to Life Springs, however, Mother changed her mind and

opted for outpatient treatment so that she could keep working at Heartland Automotive. Mother's progress led to the THV in August 2015, which was short lived. In addition to having significant difficulty parenting the children, Mother lost her job in October 2015 and then experienced drug relapses in November and December 2015. The children were returned to foster care on December 14, 2015, and have not returned to Mother's care.

[38] After the children's removal, Mother spent much of 2016 in jail for various probation violations and lived here and there when not incarcerated. She did not actively engage in services, keep in contact with DCS, maintain stable housing or income, or submit to DCS drug screens. Moreover, there is no indication in the record that she sought inpatient treatment during this time.

[39] At the termination hearing in June 2017, Mother testified that she had been living with her new boyfriend in Indianapolis for about four months in a house where they were renting a room. She claimed to be sober but offered no proof and indicated that she still needed to go through inpatient treatment. Additionally, Mother had a part-time job, making minimum wage, that she had just obtained three months before the termination hearing.[6]

[40] The essence of Mother's argument on appeal is that she should be given additional time and an opportunity to gain lifelong sobriety with inpatient

---

[6] Prior to obtaining this part-time employment in March 2017, Mother had not maintained employment for more than a month since October 2015.

treatment. She also claims that by the time of the hearing, she had addressed her addiction and lack of housing and employment. Mother describes her history of substance abuse as "occasional[] in times of severe stress" and shockingly asserts that "[e]ven when she was using drugs, she did not expose her children to them". *Appellant's Brief* at 27, 22.

[41] In other words, Mother invites us to reweigh the evidence and substitute our judgment for that of the trial court, which we will not do on appeal. The trial court's conclusion that there is a reasonable probability that the conditions resulting in the children's removal and continued placement outside Mother's care will not be remedied is well-supported by the evidence and findings.[7] Moreover, the record does not support Mother's assertion that she is "well on her way to overcoming the obstacles which prevented her from parenting her children previously." *Id*. at 28. On the contrary, after more than four years of DCS involvement with the family, it does not appear that Mother is in a significantly better position to parent the children than she was in 2013 when J.F. and S.J. were adjudicated CHINS, in 2014 when A.J. was adjudicated a CHINS, in 2015 when A.K. was so adjudicated, or in April 2016 when Mother last saw the children.

---

[7] Having determined that this conclusion regarding the remedy of conditions is not clearly erroneous, we need not address Mother's assertion that DCS failed to prove that the continuation of the parent-child relationship posed a threat to the well-being of the children. *See* I.C. § 31-35-2-4(b)(2)(B) (written in the disjunctive).

[42] Finally, Mother challenges the trial court's finding that termination of her parental rights is in the children's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[43] Here, the same CASA had been with the family since December 2012. The CASA testified at the termination hearing that after all these years, Mother was in no better place to parent than when the CHINS case started. The children, on the other hand, were thriving in their pre-adoptive foster home and were now well-mannered, loving children. In the CASA's opinion, returning the

children to Mother's care would be traumatizing to both the children and Mother, and termination of parental rights was in the children's best interests.

[44] The children need and deserve permanency after all these years, and they have found that in their pre-adoptive home. Although we do not doubt that Mother loves the children, she has demonstrated time and again that she is unable to care for them on a consistent basis in a safe, stable, drug-free home. Indeed, Mother has a history of making poor choices that have negatively impacted herself and her children. The trial court's finding that termination was in the children's best interests was supported by the evidence and findings, as was its judgment terminating Mother's parental rights.

[45] Judgment affirmed.

May, J. and Vaidik, C.J., concur.